# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DEBORAH PETTRY, derivatively on behalf of FEDEX CORPORATION,

        Plaintiff,

        v.

FREDERICK W. SMITH, DAVID J. BRONCZEK, ALAN B. GRAF, JR., HENRY J. MAIER, DAVID P. STEINER, SHIRLEY ANN JACKSON, JOHN A. EDWARDSON, JOSHUA A. RAMO, R. BRAD MARTIN, KIMBERLY A. JABAL, PAUL S. WALSH, SUSAN C. SCHWAB, MARVIN R. ELLISON, JOHN C. INGLIS, STEVEN R. LORANGER, GARY W. LOVEMAN, and JAMES L. BARKSDALE,

        Defendants,

    and

FEDEX CORPORATION, a Delaware corporation,

        Nominal Defendant.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

**C.A. No. 2019-0795-JRS**

## MEMORANDUM OPINION

Date Submitted: April 6, 2021
Date Decided: June 28, 2021

Robert D. Goldberg, Esquire of Biggs and Battaglia, Wilmington, Delaware and Brian J. Robbins, Esquire, Stephen J. Oddo, Esquire and Emily R. Bishop, Esquire of Robbins LLP, San Diego, California, Attorneys for Plaintiff Deborah Pettry.

Lisa A. Schmidt, Esquire, Alexander M. Krischik, Esquire and Nicole M. Henry, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants Frederick W. Smith, David J. Bronczek, Alan B. Graf, Jr., Henry J. Maier, David P. Steiner, Shirley Ann Jackson, John A. Edwardson, Joshua C. Ramo, R. Brad Martin, Kimberly A. Jabal, Paul S. Walsh, Susan C. Schwab, Marvin R. Ellison, John C. Inglis, Steven R. Loranger, Gary W. Loveman, James L. Barksdale and Nominal Defendant FedEx Corporation.

**SLIGHTS, Vice Chancellor**

FedEx Corporation is the world's largest express transportation company. In 2012, its carriers delivered an average of 7,538,000 packages per day. Over the course of a six-year span, state and federal regulators estimate that, among those packages, an infinitesimal percentage of them contained illegal cigarettes. Specifically, regulators alleged that, from 2006 through 2012, FedEx carriers delivered approximately 390,000 cartons of untaxed, unstamped cigarettes to New York residents in approximately 32,000 separate deliveries. Enforcement actions followed. In 2018, FedEx settled the actions by paying $35.3 million and agreeing to several internal reforms.

A FedEx stockholder brought this derivative action purportedly on behalf of FedEx against its board of directors (the "Board") alleging that Board members breached their duty of loyalty by consciously failing to oversee FedEx's compliance with state and federal laws governing the transportation and delivery of cigarettes. She has also sued two FedEx officers, alleging they breached their duties of care and loyalty by failing to prevent the illegal cigarette shipments. Among other damages, the plaintiff looks to recover the $35 million payment FedEx was required to make to settle the New York enforcement actions.

After obtaining FedEx's response to her books and records demand under 8 *Del. C.* § 220, the plaintiff filed her Verified Stockholder Derivative Complaint ("Complaint") comprising a single count in which she alleges breach of fiduciary

1

duty against members of the Board arising from a failure of oversight, the proverbial *Caremark* claim under Delaware law,[1] and breaches of the fiduciary duties of care and loyalty against the two officers for their role in failing to prevent the illegal shipments.

Plaintiff elected not to demand that the Board investigate and prosecute her claims. She instead has alleged that any such demand would have been futile because each member of the Board faces a substantial likelihood of personal liability. Defendants disagree and have moved to dismiss the Complaint as to all Defendants under Court of Chancery Rule 23.1 for failure to plead demand futility or, in the alternative, Court of Chancery Rule 12(b)(6) for failure to state a viable claim.

After carefully reviewing the Complaint and its properly incorporated documents, and carefully considering the parties' arguments with respect to the Defendants' Motion, I am satisfied the plaintiff has failed to well plead that a majority of the Board that would have considered her demand was unfit to do so such that demand would have been futile. More specifically, the plaintiff has failed adequately to plead that a majority of the Board faces a substantial likelihood of

---

[1] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996), *aff'd sub nom Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006) (reviewing and restating the duties of directors to oversee corporate operations).

liability on her claims or that they are otherwise disabled by interest or lack of independence. Accordingly, the Complaint must be dismissed with prejudice under Court of Chancery Rule 23.1. Having so concluded, I need not reach Defendants' arguments under Court of Chancery Rule 12(b)(6).

## I. BACKGROUND

I have drawn the facts from well-pled allegations in the Complaint and documents incorporated by reference or integral to that pleading.[2] For purposes of the motion, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[3]

### A. Parties

Plaintiff, Deborah Pettry, has been a stockholder of FedEx Corporation continuously since 2014.[4]

Nominal Defendant, FedEx Corporation, a Delaware corporation, is a holding company that provides "transportation, e-commerce and business services internationally through wholly-owned subsidiaries" that include Federal Express Corporation ("FedEx Express"), FedEx Ground Pack System ("FedEx Ground"),

---

[2] Verified Compl. ("Compl.") (D.I. 1); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[3] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[4] Compl. ¶ 11.

3

FedEx Freight Corporation and FedEx Corporate Services, Inc. (all identified subsidiaries, together, "FedEx" or the "Company").[5] As of May 31, 2019, FedEx employed over 285,000 full-time employees and collectively delivered in excess of 15 million packages per day.[6]

Defendants are current or former officers and directors of FedEx, all of whom held those positions during the time of the alleged wrongdoing.[7] Defendant, Frederick Smith, founded FedEx in 1971 and has served as Chairman of the Board and CEO of the Company since 1998.[8] Defendant, Henry Maier, is FedEx Ground's President, and has served in this role since June 2013.[9] Smith and Maier, together, are referred to hereafter as the "Officer Defendants."[10]

Defendants, John Edwardson, Joshua Ramo, David Steiner, Shirley Jackson, Brad Martin, Kimberly Jabal and Gary Loveman, each served on the Company's

---

[5] Compl. ¶ 12.

[6] *Id.*

[7] Compl. ¶¶ 13–30.

[8] Compl. ¶ 13.

[9] Compl. ¶ 16.

[10] Since the filing of the Complaint, the other two officers named in this litigation, David Bronczek and Alan Graf, have been dismissed. D.I. 19.

Board and Audit Committee during the relevant time period.[11] Where appropriate, they are collectively referred to as the "Audit Committee Defendants."

Along with the Audit Committee Defendants, Defendants, Martin Ellison, Susan Schwab, Paul Walsh, John Inglis and Smith, were all members of the Board during the relevant time and were also members of the Board at the time this lawsuit was filed.[12] These Defendants collectively are referred to as the "Demand Defendants" and make up the "Demand Board."[13]

The final two Defendants, Steven Loranger and James Barksdale, were members of the Board during the time of the alleged wrongdoing but were no longer on the Board at the time this lawsuit was filed. All of the Defendants, except Henry Maier, are collectively referred to as the "Director Defendants."[14]

## B. The Regulation of Tobacco Shipments

FedEx, as a major common carrier, is subject to an array of statutes and regulations including federal, state and local laws governing the transportation of

---

[11] Compl. ¶¶ 17–22, 28, 36. Of the Audit Committee Defendants, only Mr. Loveman was not on the Board that would have considered a litigation demand. Compl. ¶ 73.

[12] Compl. ¶¶ 13, 23–26, 73.

[13] Non-party, Patricia Griffith, was the twelfth and final member of the Demand Board.

[14] Compl. ¶¶ 27, 29.

cigarettes and other tobacco products.[15] Under federal law, FedEx is subject to the Contraband Cigarette Trafficking Act ("CCTA"), which prohibits transactions involving cigarettes not bearing appropriate state tax stamps; the Prevent All Cigarette Trafficking Act ("PACT"), which prohibits remote cigarette purchases and delivery of tobacco products through the United States Postal Service; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which makes illegal cigarette trafficking a racketeering offense; and, finally, 49 U.S.C. § 80302, which prohibits common carriers from transporting contraband cigarettes.[16] Under relevant state law (in this instance, New York law), FedEx is subject to New York Public Health Law § 1399-11 ("Section 1399-11"), which prohibits common carriers, including FedEx, from delivering cigarettes directly to unlicensed cigarette dealers.[17]

## C. New York's Cigarette Trafficking Investigations and Enforcement

In 2004, the New York Attorney General ("NYAG") "initiated an investigation into FedEx's illegal shipment of cigarettes to individual New York consumers and residences."[18] FedEx resolved that investigation two years later, in February 2006, by entering into an Assurance of Compliance agreement ("AOC")

---

[15] Compl. ¶¶ 41–43.

[16] Compl. ¶ 42.

[17] Compl. ¶ 43.

[18] Compl. ¶¶ 3, 45.

with the NYAG.[19]  Under the AOC, FedEx "agreed to cease all deliveries to unlicensed persons in New York," as required by Section 1399-11.[20]  The AOC also mandated that FedEx "implement internal processes and controls designed to assure that the Company would not engage in further illegal cigarette deliveries."[21]  FedEx agreed to pay $1,000 for each violation of the AOC moving forward.[22]

Following the AOC, customers continued to use FedEx to ship thousands of cartons of cigarettes, including unstamped cigarettes.[23]  These customers included Cigarettes Direct to You ("CD2U"), Native Made Tobacco ("Native Tobacco"), FOW Enterprises, Inc. ("FOW") and Shinnecock Smoke Shop ("Shinnecock").[24]

In August 2011, the City of New York (the "City") informed FedEx that it had violated state and federal laws by shipping and delivering cigarettes for CD2U.[25]  As a result of the alleged violations, the City demanded FedEx Ground pay $6.5 million in taxes that had been avoided by the CD2U shipments.

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Compl. ¶ 46.

[24] *Id.*

[25] Compl. ¶ 47.

7

FedEx declined.[26] On March 12, 2012, the City served a subpoena on FedEx Ground and, a year later, on March 15, 2013, FedEx paid the City $2.4 million to settle.[27] This settlement spurred the City and the state of New York to serve further subpoenas related to other potentially illegal cigarette shipments.[28]

On December 30, 2013, the City filed a lawsuit in federal court, with the state of New York joining on March 30, 2014 and adding further claims, accusing FedEx of violating the CCTA, PACT, RICO, Section 1399-11 and the AOC.[29] The complaint alleged FedEx made 20,000 deliveries of 121,000 cartons of cigarettes for Shinnecock between 2006 and 2012, 10,500 deliveries of 260,000 cartons of cigarettes for CD2U between 2006 and 2009, 900 deliveries of 7,850 cartons of cigarettes for Native Tobacco between 2007 and 2012, and 600 deliveries of 3,220 cartons of cigarettes for FOW between 2006 and 2012.[30]

The enforcement action did not cause FedEx to cease the illegal shipments of cigarettes.[31] This led to another lawsuit on December 11, 2017, again filed by the

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] Compl. ¶ 48.

[30] Compl. ¶¶ 49–51.

[31] Compl. ¶ 54.

City and state of New York, alleging further illegal shipments through at least April 2016.[32]  On October 5, 2018, the federal court presiding over each of the enforcement actions against FedEx granted plaintiffs' motion for summary judgment, finding that FedEx knowingly shipped over 10,000 unstamped cigarettes in violation of Section 1399-ll and the AOC.[33]

"In December 2018, FedEx agreed to settle all pending enforcement actions for $35.3 million."[34]  "As part of the settlement, the Company also agreed to implement annual training on tobacco shipments and employ an independent consultant to assist with identifying and halting illegal tobacco shipments in New York."[35]

## D. Board Conduct Regarding Cigarette Shipments

By at least July 16, 2012, the Board was aware that the Company was violating the AOC and that the City was investigating FedEx for its role in shipping and delivering unstamped and untaxed cigarettes.[36]  Plaintiff pegs July 16, 2012, because that is the day the Company's General Counsel, Christine Richards, updated the

---

[32] *Id.*

[33] Compl. ¶ 55.

[34] Compl. ¶ 56.

[35] Compl. ¶ 67.

[36] Compl. ¶ 58.

Board on the status of the then-pending enforcement actions related to the shipment of cigarettes.[37] Roughly two weeks prior, on July 3, 2012, the Company's outside counsel, K&L Gates LLP, issued a report of its findings after an internal investigation of the Company's cigarette shipping practices in which it determined that FedEx was not complying with the AOC (the "K&L Report").[38] Ms. Richards allegedly relayed the conclusions of the K&L Report to the Board as part of her July 16 presentation.[39] Following this meeting, the Board routinely received updates on the cigarette enforcement actions.[40] In fact, "between January 2014 and December 2015, the Board was updated regarding this litigation on at least eleven different occasions."[41] Separately, the Audit Committee likewise routinely received updates regarding the cigarette litigation.[42]

In June 2014, the Board created a committee (the "2014 Demand Committee") to investigate allegations contained in a demand letter sent by a concerned stockholder requesting that the Company bring claims against FedEx directors and

---

[37] *Id.*

[38] Compl. ¶ 59.

[39] *Id.*

[40] Compl. ¶ 60.

[41] Compl. ¶ 7.

[42] Compl. ¶¶ 64–65; *see also* Compl. ¶ 7 ("During this time, the Audit Committee also discussed the cigarette transportation litigation on at least six separate occasions.").

10

officers regarding the Company's unlawful cigarette shipping practices.[43] The 2014 Demand Committee released a report in 2019 detailing its findings (the "Demand Report") and ultimately concluded it was not in the best interests of FedEx to bring a lawsuit against its directors and officers.[44]

Citing both Board meeting minutes and the Demand Report, Plaintiff alleges that, notwithstanding its full awareness of FedEx's illegal conduct, "the Board failed to take any action to address the unlawful practices, and the Company continued to violate the law."[45] The illegal shipment of cigarettes around the country lasted at least until April 2016, when the company announced it was banning the shipment of cigarettes across its platform with few exceptions.[46] The Demand Report indicates that two employees were disciplined for failure to discharge their responsibility to ensure compliance with the AOC and applicable state and federal laws.[47] And, as mentioned, FedEx agreed, following its December 2018 settlement with the City and state of New York, to implement annual training regarding tobacco shipments and

---

[43] Opening Br. in Supp. of Defs.' Mot. to Dismiss Pl.'s Verified Compl. ("OB") (D.I. 12), Ex. 7 ("Demand Report") at 5.

[44] *Id.* at 42.

[45] Compl. ¶ 66; *see also* Compl. ¶ 76 ("[The Audit Committee Defendants] failed to implement any remedial measure or take any other action to remedy the issues or ensure the Company complied with the law and the AOC going forward.").

[46] Compl. ¶ 66.

[47] Demand Report at 11.

to develop systems to identify potential illegal cigarette shipments moving forward.[48]

### E. Procedural History

Plaintiff filed her Complaint on October 3, 2019, after obtaining books and records from the Company under 8 *Del. C.* § 220. The Complaint asserts one derivative claim on behalf of FedEx against the Director Defendants for breach of the duty of loyalty for lack of oversight and against the Officer Defendants for their gross negligence (at least) in disregarding the illegal activity associated with cigarette shipments. The Complaint alleges that on July 16, 2012, the Board was alerted to illegal cigarette shipments that occurred from 2006 to 2012. Notwithstanding this knowledge, the Complaint alleges the Board did nothing to remediate the shipments, that the shipments continued to occur until April 2016 and that the Company was forced to pay roughly $35 million in settlement with New York regulators as a result of prior illegal cigarette shipments.

On November 5, 2019, Defendants filed a joint motion to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to make a pre-suit demand or plead demand futility, and under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Defendants argue that the action

---

[48] Compl. ¶ 67.

must be dismissed because, contrary to the Complaint's conclusory allegations, the Board did not "do nothing" in response to being alerted about past illegal cigarette shipments in July 2012, but rather was engaged with counsel about the enforcement actions, deferred to the 2014 Demand Committee to investigate and react, reprimanded employees, banned all cigarette shipments in April 2016 and instituted certain training and compliance programs in 2018. Plaintiff responds by noting that any action supposedly taken by the Board was taken too late and at a time where the damage had already been done. This matter was submitted for decision on April 6, 2021.

## II. ANALYSIS

By declining to make a litigation demand on the Board, Plaintiff has denied the Board of its presumptive right to manage the Company, including its right to manage the Company's litigation asset. In doing so, Plaintiff was obliged to justify her bypass of the Board by pleading with particularity the reasons why the Board was disabled from performing its management function with respect to the investigation and prosecution of the claims brought in the Complaint. She has failed to do so. Instead, she has "conflate[d] concededly bad outcomes from the point of view of the Company with bad faith on the part of the Board."[49] Because I have

---

[49] *In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *11 (Del. Ch. June 26, 2015).

concluded that demand is not excused under Chancery Rule 23.1, I will not reach Defendants' arguments under Rule 12(b)(6).[50] The analysis begins and ends with demand futility.

## A. The Demand Futility Standard

"A cardinal precept of the General Corporation Law of the state of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[51] Plaintiff's claim against all Defendants for breach of fiduciary duty alleges harm suffered by FedEx. Thus, the claim belongs to FedEx and the decision whether to pursue the claim presumptively lies with the Board.[52] With that said, our law recognizes that, "[i]n certain circumstances, stockholders may pursue litigation derivatively on behalf of the corporation as a matter of equity to redress the conduct

---

[50] Plaintiff has not meaningfully attempted to allege that a majority of the Demand Board is conflicted, either by lack of independence or interest, with respect to the Officer Defendants or the non-Demand Board Director Defendants. For that reason, I do not address the claims against the Officer Defendants separately under Rule 12(b)(6). *See Marchand v. Barnhill*, 2018 WL 4657159, at *16 (Del. Ch. Sept. 27, 2018), *rev'd on other grounds*, 212 A.3d 805 (Del. 2019) ("The Complaint offers no reason to doubt that [the majority of the board was] independent of the Officer Defendants and would have been capable of impartially considering a demand.").

[51] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[52] *White v. Panic*, 783 A.2d 543, 550 (Del. 2001) ("In most situations, the board of directors has sole authority to initiate or to refrain from initiating legal actions asserting rights held by the corporation.").

of a torpid or unfaithful management . . . where those in control of the company refuse to assert (or are unfit to consider) a claim belonging to it."[53]

"Because stockholder derivative suits by [their] very nature . . . impinge on the managerial freedom of directors, our law requires that a stockholder satisfy the threshold demand requirements of Court of Chancery Rule 23.1 before he is permitted to assume control of a claim belonging to the corporation."[54] Rule 23.1, similar to Rule 9(b) in the context of fraud, requires pleadings to "comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)."[55] To meet the Rule 23.1 requirements, the stockholder must plead with particularity either that she made a demand on the company's board of directors to pursue particular claims or why any such demand would be futile, thereby excusing the need to make a demand altogether.[56] Where, as here, the stockholder plaintiff chooses the latter path, she

---

[53] *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *27 (Del. Ch. Jan. 27, 2021), as corrected (Feb. 4, 2021) (quoting *Cumming v. Edens*, 2018 WL 992877, at *11 (Del. Ch. Feb. 20, 2018) (internal quotations omitted)).

[54] *Horman v. Abney*, 2017 WL 242571, at *6 (Del. Ch. Jan. 19, 2017) (cleaned up).

[55] *Brehm*, 746 A.2d at 254.

[56] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004); *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

"must plead particularized facts creating a reasonable doubt concerning the Board's ability to consider the demand."[57]

While the continued utility of a binary approach to demand futility legitimately has been called into question, for now, Delaware still applies one of two tests when deciding whether demand upon the board would be futile.[58] The first, established in *Aronson v. Lewis*, "applies to claims involving a contested transaction i.e., where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties."[59] The second, established in *Rales v. Blasband*,[60] applies where a majority of the current members of the board "had not participated in the challenged decision,"[61] or "where the subject of a derivative suit is not a business decision . . . [such as when the board is alleged to have violated its]

---

[57] *In re CBS*, 2021 WL 268779, at *28.

[58] *See United Food & Commerc. Workers Union v. Zuckerberg*, 2020 WL 6266162, at *9 (Del. Ch. Oct. 26, 2020) (observing that "the *Aronson* test has proved to be comparatively narrow and inflexible in its application, and its formulation has not fared well in the face of subsequent judicial developments").

[59] 473 A.2d at 814; *see also Wood*, 953 A.2d at 140 (explaining the two demand futility tests). Under *Aronson*, the plaintiff must plead particularized facts that create a reasonable doubt that (i) the directors are disinterested and independent or (ii) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Wood*, 953 A.2d at 140.

[60] 634 A.2d 927 (Del. 1993).

[61] *Zuckerberg*, 2020 WL 6266162, at *16.

oversight duties."[62]  "The central question of a *Rales* inquiry, no matter the context, is the same: 'whether the board can exercise its business judgment on the corporate behalf in considering demand.'"[63]  In refining that question, *Rales* instructs that a director cannot objectively exercise her business judgment in considering a demand if she is either (1) "interested," meaning, among other things, that she faces a "substantial likelihood of liability" for her role in the alleged corporate wrongdoing; or (2) not independent of another interested fiduciary.[64]

"On a motion to dismiss pursuant to Rule 23.1, the Court considers the same documents, similarly accepts well-pled allegations as true, and makes reasonable inferences in favor of the plaintiff—all as it does in considering a motion to dismiss under Rule 12(b)(6)."[65]  Given the heightened pleading requirements of Rule 23.1, however, "conclusory allegations of fact or law not supported by allegations of

---

[62] *Wood*, 953 A.2d at 140; *see also Horman*, 2017 WL 242571, at *6 (holding that *Rales* applies "when a plaintiff challenges board inaction such as when a board is alleged to have consciously disregarded its oversight duties").

[63] *McElrath ex rel. Uber Techs. v. Kalanick*, 2019 WL 1430210, at *8 (Del. Ch. Apr. 1, 2019), *aff'd sub nom. McElrath v. Kalanick*, 224 A.3d 982 (Del. 2020) (quoting *Inter-Mktg. Gp. USA, Inc. v. Armstrong*, 2019 WL 417849, at *4 (Del. Ch. Jan. 31, 2019)).

[64] *Rales*, 634 A.2d at 934, 936 (noting that, at bottom, the court must "determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand"); *In re CBS*, 2021 WL 268779, at *28 (same).

[65] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 976 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004) (citing *White*, 783 A.2d at 549).

specific fact may not be taken as true."[66] In this case, because the Complaint cites documents Plaintiff obtained through her Section 220 demand, I may consider those documents under the incorporation-by-reference doctrine to determine whether the Complaint has accurately referenced their contents in support of its claims and in pleading demand futility.[67]

While the Complaint makes a half-hearted attempt to question the independence of one director, Smith, the gravamen of the Complaint's demand futility allegations is that a majority of the Demand Board is interested under *Rales* because their "inaction" when confronted with the Company's illegal cigarette shipments was "of a nature that would expose [them] to 'a substantial likelihood' of personal liability."[68]

## B. The *Caremark* Standard

As Chancellor Allen first observed in *Caremark*, and has since been emphasized by this court many times, perhaps to redundance,[69] the claim that

---

[66] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988) (cleaned up).

[67] *Reiter on Behalf of Cap. One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *5–6 (Del. Ch. Oct. 18, 2016); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016).

[68] *Horman*, 2017 WL 242571, at *6 ("Particularized facts create a reasonable doubt of the board's independence and disinterestedness when the demand would reveal board inaction of a nature that would expose the board to 'a substantial likelihood' of personal liability.").

[69] *See Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *1 (Del. Ch. Aug. 24, 2020) ("It has become among the hoariest of Chancery clichés for an

18

corporate fiduciaries have breached their duties to stockholders by failing to monitor corporate affairs is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[70]  A decade after *Caremark*, our Supreme Court affirmed the doctrine Chancellor Allen announced there and clarified that our law will hold directors personally liable only where, in failing to oversee the operations of the company, "the directors knew that they were not discharging their fiduciary obligations."[71]  At the pleadings stage, a plaintiff must allege particularized facts that satisfy one of the necessary conditions for director oversight liability articulated in *Caremark*: either that (1) "the directors utterly failed to implement any reporting or information system or controls"; or (2) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[72]

---

opinion to note that a derivative claim against a company's directors, on the grounds that they have failed to comply with oversight duties under *Caremark*, is among the most difficult of claims in this Court to plead successfully.").

[70] *Caremark*, 698 A.2d at 967; *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at \*7 (Del. Ch. Nov. 30, 2007) (same); *Desimone v. Barrows*, 924 A.2d 908, 939 (Del. Ch. 2007) (same); *Guttman v. Huang*, 823 A.2d 492, 506 n.33 (Del. Ch. 2003) (same).

[71] *Stone*, 911 A.2d at 370.

[72] *Id.*

The *Caremark* standard "draws heavily upon the concept of director failure to act in good faith."[73] As our Supreme Court explained in *In re Walt Disney Co. Derivative Litigation*, the "intentional dereliction of duty" or "conscious disregard for one's responsibilities," which "is more culpable than simple inattention or failure to be informed of all facts material to the decision," reflects that directors have acted in bad faith and cannot, by default, avail themselves of defenses grounded in a presumption of good faith.[74] In order to plead a derivative claim under *Caremark*, therefore, a plaintiff must plead particularized facts that allow a reasonable inference the directors acted with scienter which, in turn, "requires [not only] proof that a director acted inconsistent[ly] with his fiduciary duties," but also "most importantly, that the director knew he was so acting."[75]

"Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so."[76] Rather, the plaintiff must plead with particularity

---

[73] *Id.* at 369.

[74] 906 A.2d 27, 66 (Del. 2006).

[75] *In re Massey Energy Co.*, 2011 WL 2176479, at *22 (Del. Ch. May 31, 2011).

[76] *Desimone*, 924 A.2d at 940.

"a sufficient connection between the corporate trauma and the board."[77] To draw that connection, the plaintiff must well plead facts that allow an inference that the directors' behavior falls within either prong one (no oversight system or controls) or two (failure to oversee once controls are in place) of *Caremark*.[78]

Plaintiff concedes that the only claim raised in her Complaint is that a majority of the Demand Defendants violated their *Caremark* duties under prong two.[79] In other words, there is no allegation that the Board utterly failed to implement *any* reporting or information systems of controls. "To state a 'prong two' *Caremark* claim, Plaintiff must 'plead [particularized facts] that the board knew of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct.'"[80]

---

[77] *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).

[78] *Stone*, 911 A.2d at 370.

[79] Answering Br. in Opp'n to Defs.' Mot. to Dismiss Pl.'s Verified Compl. ("AB") (D.I. 16) at 16–34.

[80] *Chou*, 2020 WL 5028065, at *17 (quoting *Reiter*, 2016 WL 6081823, at *8) (alterations in original).

## C. The Complaint Fails to Well Plead the Demand Directors Consciously Disregarded Red Flags

Plaintiff's focus on "red flags" the Board is alleged to have consciously ignored begins with the delivery of the K&L Report to the Board on July 16, 2012.[81] To understand the significance of this focus, it is useful to note that the litigation filed on December 30, 2013 by the City, and supplemented on March 30, 2014 by the state of New York, concerned alleged illegal cigarette shipments from 2006 to 2012, a time period prior to the K&L Report.[82] Those shipments, therefore, are not part of the corporate trauma that forms the basis of Plaintiff's claim.[83] The illegal shipments at issue are those that followed the K&L Report and resulted in

---

[81] Compl. ¶ 6 ("[R]epeated warnings that FedEx's cigarette deliveries were unlawful . . . began in 2012 when an internal investigation revealed that FedEx was not complying with the AOC."); Compl. ¶¶ 58–59 ("[B]y July 2012, [the Board was] aware of FedEx's noncompliance with the AOC."). I note that neither the Complaint nor Plaintiff's brief alleges that the AOC itself was a red flag that put the Board on notice of continued illegal cigarette shipments. AB at 17–19 (discussing a handful of potential red flags without any mention of the AOC).

[82] Compl. ¶¶ 48–51.

[83] The K&L Report was commissioned *by the Board* after the City served FedEx with a subpoena related to CD2U cigarette shipments in March 2012. Compl. ¶¶ 57–59. Of course, the Board's initiation of an internal investigation in response to a subpoena can hardly be characterized as its conscious disregard of a red flag. It is not surprising, therefore, that Plaintiff would have the Court focus on post-K&L Report events, as the report itself is powerful evidence that the Board responded to red flags when they saw them.

22

litigation— shipments from 2012 through April 2016—all of which were the subject of the NYAG's December 11, 2017 enforcement action.[84]

According to Plaintiff, in response to the K&L Report, the Board "failed to take *any action* to address the unlawful practices, and the Company continued to violate the law."[85] That conclusory allegation ignores other facts acknowledged in the Complaint.

First, the Complaint's well-pled allegations make clear that both the entire Board and the Audit Committee were kept apprised of the ongoing enforcement actions from inception through settlement. The Complaint notes that between January 2014 and December 2015, the Board was updated on eleven separate occasions, while the Audit Committee was apprised of the status of the litigation at least six different times.[86] The Board's level of engagement during this time period does not support an inference of bad faith indifference and distinguishes this case from one of Plaintiff's favorite cases, *Teamsters v. Chou*.[87] There, in finding that the plaintiff well pled the board of a pharmaceutical company had failed to monitor the company's compliance with federal regulations, the court emphasized the

---

[84] Compl. ¶ 54.

[85] Compl. ¶ 66 (emphasis added).

[86] Compl. ¶¶ 7, 59–66.

[87] *Chou*, 2020 WL 5028065.

23

complaint's allegations that the board had commissioned an investigation by outside counsel but the board's "Audit Committee never received *any* reports specifically concerning compliance."[88]  Here, as indicated, the Complaint pleads the opposite.

Second, the Board formed the 2014 Demand Committee to consider a stockholder demand related to the alleged illegal cigarette shipments and prior settlements with the City and state of New York.[89]  The Demand Report, incorporated by reference at paragraphs 6, 47, 58 and 59 of the Complaint, released in 2019, found that the Company should not bring claims against the Director Defendants for violation of their duty of oversight related to illegal cigarette shipments because there was no evidence of bad faith.[90]  The existence of the

---

[88] *Id.* at *20.

[89] Demand Report at 5.

[90] *Id.* at 42.  I note that the Demand Report, among other Section 220 documents, is incorporated by reference into the Complaint to the extent it directly disputes Plaintiff's conclusory assertion that the Board did nothing when it became aware illegal cigarette shipments continued following the AOC.  *See, e.g.*, Compl. ¶ 66 ("Nonetheless, the Board failed to take any action to address the unlawful practices, and the Company continued to violate the law."); *see also Phoenix Mgmt. Tr. v. Win S. Credit Union*, 2019 WL 1575272, at *5 (Del. Ch. Mar. 25, 2019) ("When incorporation-by-reference is appropriate, a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations." (internal quotations omitted)).  In her brief, Plaintiff argues that the Section 220 documents reflect the Board's complete lack of discussion or action regarding the illegal cigarette shipments.  AB at 36 (discussing the lack of board minutes reflecting Board discussions as evidence that no remediation efforts occurred).  To the extent the Demand Report, a document made available to Plaintiff under Section 220 and referenced in the Complaint, directly contradicts that allegation, it is incorporated here for that purpose.

24

Demand Report alone refutes any reasonable inference that the Board sat idly by while red flags whipped in the breeze before its members.[91]

Third, Plaintiff acknowledges that several Company personnel were reprimanded for their handling of the CD2U account and issues related to the AOC following the issuance of the K&L Report.[92] While Plaintiff argues there is no indication the Board knew about the reprimands, the fact that reprimands occurred

---

[91] *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 655 (Del. Ch. 2008) ("Where, as here, the board employed a special committee that met frequently, hired reputable advisors, and met frequently itself, a *Caremark*-based liability theory is untenable."). Plaintiff argues that the 2014 Demand Committee's decision to wait until the conclusion of the New York litigation to issue the Demand Report creates a reasonable inference that the 2014 Demand Committee was not active and consciously disregarded its duties. AB at 27. That argument, however, calls on the Court improperly to "second-guess the timing and manner of the board's response to [] red flags" and rests on a factual predicate that "fails to state a *Caremark* claim." *In re Qualcomm Inc. FCPA S'holder Deriv. Litig.*, 2017 WL 2608723, at *4 (Del. Ch. June 16, 2017). The 2014 Demand Committee, in its business judgment, concluded "in lieu of creating a parallel factual record . . . it would instead continue to monitor the formal record as developed in the New York Litigation as a part of its ongoing investigation of the claims set forth in the Demand, but defer a final recommendation to the Board until such time as that proceeding had concluded." Demand Report at 7. Plaintiff's quibbles with that approach amount to nothing more than a disagreement about the merits of a deliberate decision, and the resultant timing of responsive measures, and fall well short of supporting an inference of bad faith. *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 135 n.96 (Del. Ch. 2009) ("[J]udges are in no position to second guess well-informed business decisions made in good faith, and the allegations in the Complaint are not sufficient to suggest that the directors knowingly or in bad faith disregarded their duty to monitor.").

[92] Reply Br. in Supp. of Defs.' Mot. to Dismiss Pl.'s Verified Compl. ("RB") (D.I. 26) at 16; Demand Report at 11 ("As a result of the K&L Gates report, sales manager Grant Kuhn and account executive Renee Thomas were disciplined by the Company for their handling of the CD2U account. In addition, staff director Andy Lynn was reprimanded for failing to ensure compliance with the communications and reporting requirements of the AOC.").

is contrary to the "do nothing" environment within a company that often fosters board-level *Caremark* liability.[93]

Finally, and perhaps most importantly, the Complaint acknowledges that: (1) by at least April 2016, FedEx banned nearly all tobacco shipments;[94] and (2) in 2019, following the December 2018 settlement with the City and state of New York, FedEx introduced numerous training programs and implemented measures to increase the detection of illegal cigarette shipments.[95] Plaintiff does not deny that these actions were taken to remedy the problems at issue in the New York litigation, but rather argues, again, that the remediation measures came too late.[96] For example, she argues the 2016 policy change banning cigarette shipments "was not made until more than three years after the Board and Audit Committee were on notice of the

---

[93] *See Marchand v. Barnhill*, 212 A.3d 805, 809 (Del. 2019) (holding that board's failure to monitor compliance with FDA regulations was the product of a company-wide environment of non-responsiveness); *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *1 (Del. Ch. Oct. 1, 2019) (emphasizing the complacent environment that pervaded the entire company).

[94] Compl. ¶ 66 ("[T]he Company continued shipping contraband cigarettes until at least April 2016 . . . ."); Demand Report at 14 ("Effective January 1, 2016, FedEx banned the shipment of any tobacco, with four customer exceptions: Kroger, Meijer, Dollar General, and Spartan Nash (which carries cigarettes exclusively for Dollar General).").

[95] Compl. ¶¶ 56, 67.

[96] AB at 28–29.

compliance issues and several years after the Company began violating the AOC."[97] That allegation does not support a reasonable inference of bad faith.

At the outset, I note that the April 2016 policy change was made prior to *any* litigation filed by the NYAG concerning the time period in dispute (i.e., the period following the July 16, 2012 Board meeting where the Board became aware that illegal cigarette shipments continued after the AOC).[98] It is hard to understand this policy change as anything but a direct response to the illegal cigarette shipments of which the Board was aware that occurred between 2006 and 2012. To the extent the focus is on the manner and timing of the Board's response, that focus misses the mark for a *Caremark* claim.[99] Moreover, the Board's rationale for waiting until April 2016 to acknowledge past wrongdoing by banning nearly all cigarette shipments makes sense; the Company was embroiled in, and actively defending, litigation involving allegations of illegal cigarette shipments throughout 2013–

---

[97] *Id.* at 28.

[98] Compl. ¶ 54.

[99] *See Qualcomm Inc.*, 2017 WL 2608723, at *4.

27

2016.[100] While one might disagree with the approach, a reasonable factfinder could not conceivably find that it was the product of bad faith.[101]

Plaintiff makes much of the fact that the Company's substantial Section 220 production did not reveal a single Board minute between July 16, 2012 and February 18, 2015 evidencing a Board discussion regarding compliance with the AOC or whether the issues identified in the K&L Report were being remediated.[102] This absence of contemporaneous evidence, Plaintiff says, entitles her to the

---

[100] Compl ¶¶ 47–56. This court has acknowledged that it is appropriate for boards to take into account the implications of board-level decisions on the company's defenses in ongoing litigation. *See, e.g.*, *Brenner v. Albrecht*, 2012 WL 252286, at *1 (Del. Ch. Jan. 27, 2012) (granting a motion to stay where the litigation would prejudice the defense of a separate securities class action).

[101] *See Qualcomm*, 2017 WL 2608723, at *4; *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (emphasizing "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties"); *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *24 (Del. Ch. Dec. 18, 2017) ("[T]here are no allegations suggesting that any of [the Company's] officers or directors viewed themselves (or [the Company]) as above the law . . . the picture that emerges is of a massive, poorly integrated company that made efforts to comply with [the law] . . . . Those efforts failed in many instances, but that is not enough . . . [b]ad results alone do not imply bad faith."). As in *Corbat*, it is appropriate to note (again) the magnitude of FedEx's operations: FedEx Express and FedEx Ground together delivered an average of 7,538,000 packages *per day* in fiscal 2012. *See* OB, Ex. 12 at 49, 52 (FedEx, Annual Report (Form 10-K) (July 16, 2012)); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) (taking judicial noting of facts within a form 10-Q that were not reasonably in dispute). The number of illegal cigarette shipments dwarfs in comparison to the total number of shipments companywide. To be sure, the illegal cigarette shipments were problematic, needed to be addressed and were addressed. But Plaintiff's *Caremark* claim supposes that this was the only challenge confronting this Board. That also is not reasonably conceivable.

[102] AB at 21 n.15.

inference that the Director Defendants never even discussed, much less attempted to oversee, the remediation of illegal cigarette shipments and, thus, consciously allowed the illegality to continue. In this regard, Plaintiff cites *Hughes v. Xiaoming Hu*, where this court noted, "if the Company failed to produce a document that it would reasonably be expected to possess if a particular event had occurred, then the plaintiff is entitled to a reasonable inference that the event did not occur."[103] Plaintiff correctly quotes *Hughes* but her citation to the decision is misplaced.

First, as already mentioned, there are other documents confirming Board responses, and acknowledgements of these responses in the Complaint.[104] Those responses include the Board (and its Audit Committee) monitoring the enforcement proceedings in New York, the Company reprimanding employees, the Board enlisting the 2014 Demand Committee to investigate Board-level misconduct and make recommendations on whether to pursue claims and the Board ultimately directing that the Company ban most cigarette shipments and reform processes for

---

[103] 2020 WL 1987029, at *2 (Del. Ch. Apr. 27, 2020) (citing *Morrison v. Berry*, 191 A.3d 268, 275 n.20 (Del. 2018)); *see also In re Tyson Foods, Inc.,* 919 A.2d 563, 577 (Del. Ch. 2007) (finding the lack of exculpatory evidence in a 220 production regarding board action as creating an inference that the board took no action).

[104] Demand Report; Compl. ¶¶ 56, 59–66. *Contra Chou*, 2020 WL 5028065, at *20 (noting that not a single Section 220 document reflected board action to oversee compliance with FDA regulations).

detecting illegal shipments.[105] Plaintiff argues that, at a minimum, certain corrective measures, including reprimanding employees and the April 2016 decision to stop shipping cigarettes, evidences management rather than Board action.[106] Even if Plaintiff is correct, our law does not demand board action in all instances; if action is taken by the Company to remediate the alleged harm, that is a reflection of a lack of bad faith on the part of the Board.[107]

Second, according to the Complaint, the Board minutes actually do reflect Board-level discussions in their references to the updates the Board received regarding "the cigarette transportation litigation pending in New York."[108] The reasonable inference to draw, then, is not that the Board discussed nothing and did nothing, but rather that the Board was engaged on this issue, allowing the New York litigation to play out prior to making any determinations regarding the remediation

---

[105] Demand Report at 14; Compl. ¶¶ 56, 59–66. I note these facts, some of which are directly stated in the Complaint, distinguish this case from *In re Tyson Foods, Inc.*, where "the complaint contain[ed] detailed allegations that would lead [the court] to infer that some transactions were not, in fact, reviewed." *Tyson*, 919 A.2d at 578.

[106] AB at 28 (arguing the Board was not aware of FedEx management's decision to reprimand employees or stop shipping cigarettes).

[107] *Corbat*, 2017 WL 6452240, at *20 (noting that certain management actions, including instituting "a global, end-to-end assessment of Citi's management effectiveness" and development of "Project Andes" represented clear and sufficient responses to red flags to avoid a finding that Citi's board acted in bad faith); *Horman*, 2017 WL 242571, at *13 (finding a lack of bad faith where the board was informed of a multitude of management remediation efforts).

[108] Compl. ¶¶ 60–63.

of the underlying alleged illegal conduct.[109]  Plaintiff's conclusory allegations to the contrary are but another flawed attempt to second-guess the Board's decision making.[110]

The cases cited by Plaintiff to resist dismissal exemplify far more egregious conduct than Plaintiff has alleged here.  In *In re Massey Energy Co.*, the complaint well pled that the management of Massey, as directed by its board, "fostered a business strategy expressly designed to put coal production and higher profits over compliance with the law" and took "an openly aggressive attitude with" regulators.[111]  Massey's CEO publicly flouted "that the idea that governmental safety regulators knew more about mine safety than he did was silly."[112]  The Massey board also knew of and fostered "a corporate culture premised on the view that the company's management knew better than the law about what was necessary to run safe mines."[113]  Rather than respond to the clear red flags that Massey's management

---

[109] Here again, the lack of detailed Board minutes reflecting specific discussions or remediation steps in the midst of the Company's defense of the New York enforcement actions is not surprising given the Board's appreciation that the Company was defending, not admitting, the claims and that subpoenas for Company documents were inbound on a regular basis.  Compl ¶¶ 47–56.

[110] *Qualcomm*, 2017 WL 2608723, at *4.

[111] *Massey*, 2011 WL 2176479, at *19.

[112] *Id.*

[113] *Id.*

was belittling environmental regulations, "the Board allowed itself to continue to be dominated by [the CEO]" and did "nothing of actual substance to change the direction of the company's real policy."[114]  Here, the 2016 decision to prohibit cigarette shipping altogether and the various remedial measures taken as a result of the 2019 settlement illustrates the Board's "attitude and commitment to" ensuring compliance with federal and state cigarette shipment laws.[115]  Unlike *Massey,* there was no rogue CEO and no indifferent board fostering an environment of law breaking.

Plaintiff's reliance upon *Westmoreland City Employee Retirement System v. Parkinson* is likewise inapt.[116]  There, the Seventh Circuit, applying Delaware law, determined that directors consciously disregarded their responsibility to ensure compliance with a consent decree where the board took active steps to minimize remediation "despite repeated warnings from the FDA . . . that were directly communicated to [the CEO] and passed along to the board of directors."[117]  Here,

---

[114] *Id.*

[115] *Id.* at *20 ("Instead of becoming a corporation with a new attitude and commitment to safety that won recognition for that change from its regulators, Massey continued to think it knew better than those charged with enforcing the law, and in fact, often argued with the law itself.").

[116] 727 F.3d 719 (7th Cir. 2013).

[117] *Id.* at 726.

the Complaint fails to plead any active efforts on the part of any member of the Board or management to avoid remediation.

Similarly, in *In re Abbott Laboratories Derivative Shareholders Litigation*, the Seventh Circuit, again applying Delaware law, held that the plaintiff had well pled a *Caremark* claim where it was alleged the board "took no steps in an effort to prevent or remedy the situation . . . for such an inordinate amount of time result[ing] in substantial corporate losses, establishing a lack of good faith."[118] No such allegations are sustainable here; the Complaint acknowledges the Board actively investigated and monitored the allegations of wrongdoing and then responded (either at the Board level or through management) promptly after the litigation threat to the Company subsided. Whether that approach, in hindsight, was right or wrong is not the point; the point is that the approach was not conceivably a product of bad faith.[119]

Indeed, the Board's conduct here tracks the conduct of the United Parcel Service board of directors in *Horman v. Abney*, where the court dismissed a nearly identical *Caremark* claim for failing to plead demand futility under *Rales*.[120] There, the plaintiff alleged that the UPS board had consciously disregarded red flags related

---

[118] 325 F.3d 795, 809 (7th Cir. 2003).

[119] *See Qualcomm*, 2017 WL 2608723, at *4; *Lyondell*, 970 A.2d at 243; *Corbat*, 2017 WL 6452240, at *21.

[120] 2017 WL 242571.

to its own bouts with New York in the context of illegal cigarette shipping.[121] Notwithstanding the plaintiff's allegations that the UPS board did nothing in response to three audit committee presentations regarding the illegal shipments, the incorporated documents established that, on the board's watch, UPS increased employee training, improved reporting, added a data analytics program to identify offenders and established processes for investigating possible illegal shipments.[122] Given that the plaintiff acknowledged the board was aware of these remediation efforts, the court determined that the plaintiff failed to allege particularized facts that allowed an inference the board acted in bad faith by doing nothing in response to red flags.[123] Similarly here, the Board was informed of FedEx's noncompliance with the AOC at a July 16, 2012 Board meeting, and then, within a reasonable amount of time, the Company, with Board knowledge if not Board direction, began taking steps to monitor and then address the risks associated with the noncompliance.[124]

---

[121] *Id.* at *10–14.

[122] *Id.* at *13.

[123] *Id.*

[124] Compl. ¶¶ 58–62.  I note that Plaintiff makes a separate argument as to why the Audit Committee Defendants failed in their duty of oversight as members of that committee. AB at 34–37.  Specifically, Plaintiff argues that the Audit Committee Defendants violated FedEx policies that expressly tasked the Audit Committee with reviewing and discussing with management and the Board risk exposures and how to address such exposures. Compl. ¶ 36; AB at 34.  For the reasons already stated, Plaintiff has failed to plead that any member of the Board, including Audit Committee members, consciously disregarded red

To summarize, in response to an undisputed red flag received by the FedEx Board in July 2012 in the form of the K&L Report, the Board swiftly, and then regularly thereafter, received updates from FedEx's general counsel about ongoing litigation, first with respect to illegal cigarette shipments that occurred between 2006 and 2012, and then with respect to allegations that illegal shipments continued after 2012. When the Board was faced with a litigation demand from a shareholder in 2014 related to this precise issue, it promptly delegated its authority to investigate and respond to the 2014 Demand Committee rather than sit on its hands and do nothing. Meanwhile, FedEx management reprimanded employees who, in 2011, permitted certain illegal shipments. The Company eventually chose to institute a cigarette shipment ban altogether in April 2016.

In December 2017, the NYAG sued FedEx again for further illegal cigarette shipments from 2012 to 2016. That is the time period Plaintiff asserts the corporate trauma occurred. Yet, as already demonstrated, this was also the time period that the Board and management, to the extent possible, given the specter of ongoing litigation, began their remediation efforts. Doing anything more, as argued by Defendants, could have easily put at risk FedEx's defense in the ongoing

---

flags in bad faith. The attempt to support an inference of bad faith by referring to general policies of the Audit Committee fails for lack of specificity.

enforcement actions. Eventually, the Board chose to settle the enforcement actions in December 2018, agreeing to significant training and compliance controls. When viewing the Board and management's actions in their totality, from July 2012, when the Board was informed of the ongoing legal problems, until December 2018, when it implemented strong controls to prevent further cigarette shipments, it is not reasonably conceivable that the Board acted in bad faith in consciously disregarding its duty to oversee the affairs of the Company.[125]

---

[125] In apparent reaction to *Marchand* and *Clovis*, both involving alleged failures to monitor "mission critical operations" of the company, the parties focus at length on the extent to which the illegal cigarette shipments implicate mission critical operations of FedEx. *See Marchand*, 212 A.3d at 824; *Clovis*, 2019 WL 4850188, at *13. To reiterate, the illegal cigarette shipments at issue here, and the resulting fines, constitute an infinitesimal fraction of the overall business FedEx does on a yearly basis. *Compare* Compl. ¶¶ 49–51 (noting 32,000 illegal cigarette shipments over the span of six years), *with* OB, Ex. 12 (noting in FedEx's 2012 form 10-K that it delivered an average of 7,538,000 packages *per day* in 2012); *see also* Compl. ¶ 56 (indicating the payment of $35.3 million to settle with New York); RB, Ex. 13 at 52 (noting in FedEx's 2018 form 10-K annual revenues of $65.5 billion for 2018). That the alleged corporate trauma did not arise from mission critical operations, however, means only that the Court will not draw an inference of bad faith from the breadth and severity of the alleged illegal conduct alone; Plaintiff must plead additional facts that allow an inference the Board acted in bad faith. *Horman*, 2017 WL 242571, at *14–15 (explaining that the magnitude and duration of the illegal conduct can create an inference of bad faith with respect to the board's exercise of its duty of oversight). In other words, the flaw in Plaintiff's Complaint is not its failure to plead that the illegal cigarette shipments occurred in the midst of the Company's mission critical operations, but rather its failure to plead other facts from which an inference of scienter may reasonably be drawn.

### III. CONCLUSION

Plaintiff has failed to plead particularized facts that make it reasonably conceivable a majority of the Demand Defendants face a substantial likelihood of liability for ignoring red flags in a manner demonstrating a conscious failure to monitor or oversee corporate operations. Consequently, Plaintiff has failed to plead particularized facts that demonstrate demand on the Board would have been futile. The motion to dismiss the Complaint with prejudice, therefore, must be GRANTED.

**IT IS SO ORDERED.**